UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. S-1 4:15 CR 335 CDP (DDN) |
| ) | |
| DWANE TAYLOR, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES OF AMERICA'S
SUPPLEMENTAL OPPOSITION TO
<u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>**

COMES NOW the United States of America and opposes defendant Dwane Taylor's (Taylor) second motion to suppress evidence (Doc. #117). The United States of America States as follows in support of its response:

**INTRODUCTION**

In his most recent motion to suppress evidence, Taylor seeks to challenge law enforcement's use of a "cell site simulator" in connection with Taylor's July 24, 2015, arrest. Specifically, Taylor appears to claim that the use of the cell site simulator occurred without the issuance of a proper warrant. Not so. Following Taylor's federal indictment and the issuance of an arrest warrant, law enforcement officials applied for and received a warrant – supported by probable cause – that, among other things, expressly permitted law enforcement officials to utilize a cell site simulator. Therefore, Taylor's motion should be denied.

## RELEVANT FACTS

**A.     Overview.**

In December 2014, Taylor encountered a female named Juanita Davis (Juanita) who was a drug user and prostitute. Taylor and Juanita engaged in sex at Taylor's residence. Taylor went to sleep. Juanita was gone when Taylor awoke; as were Taylor's pants and his black and white Chevrolet Impala. Inside Taylor's missing pants were approximately a half-ounce of heroin; a half-ounce of crack cocaine; and money in the thousands of dollars. The money taken was owed by Taylor to his drug supplier. Following the taking of his drugs, money, and vehicle, Taylor received information that another female named Erin Dave (Erin) assisted Juanita after the fact with the use and/or concealment of Taylor's belongings.

**B.     December 16, 2014, Murder of Erin Davis.**

On or about December 16, 2014, Taylor and his associate, Joe Edger (Edger), were driving together. Taylor instructed Edger to drive to the area of Minnesota and Walsh to find Erin. While inside the vehicle, Edger observed Taylor holding a nine millimeter firearm. Taylor chambered a round and then concealed the firearm on his person. Edger and Taylor arrived in the area. Edger parked in front of an apartment complex. Erin walked down the street. Taylor instructed Edger that, when Taylor walked inside with Erin, Edger was to drive around the corner. Taylor exited the vehicle. Taylor and Erin talked. Taylor and Erin went inside the building of 300 Walsh. Edger drove around the corner as instructed. Shortly after going inside the building, Taylor exited, got inside the vehicle, and told Edger that he shot Erin in the face. Edger drove Taylor from the area.

The Saint Louis Metropolitan Police Department located Erin deceased inside Apartment C of 300 Walsh on December 16, 2015. It appeared she had been deceased for possibly a day or more. The Evidence Technician Unit of the Saint Louis Metropolitan Police Department recovered one nine millimeter shell casing and one projectile at the scene. The shell casing was head stamped "FC 9mm LUGER."

## C. January 16, 2015, Murder of Juanita Davis.

Following Erin's murder, Taylor and Edger continued to look for Juanita and Taylor's stolen vehicle. On or about January 16, 2015, Taylor located Juanita in the 4400 block of Pennsylvania and shot her multiple times with the same nine millimeter firearm that was used to kill Erin. Edger picked Taylor up after the murder and drove him from the area. Taylor admitted to Edger that Taylor shot and killed Juanita.

The Saint Louis Metropolitan Police Department located Juanita deceased in the street in front of 4420 Pennsylvania. The Evidence Technician Unit of the Saint Louis Metropolitan Police Department recovered one bullet and seven nine millimeter caliber shell casings. Five of the shell casings were head stamped "R-P 9mm LUGER." Two of the shell casings were head stamped "FC 9mm LUGER."

Sometime after Juanita's murder, Taylor located his stolen vehicle. Among other things, some of the money and controlled substances taken by Juanita were missing.

## D. July 16 Indictment; July 20 Cellular Telephone Warrant; and July 24 Arrest.

On July 16, 2015, Taylor was indicted by a federal grand jury for his role in, among other things, the murders of Erin and Juanita and Taylor's drug trafficking in connection with their deaths (Doc. #2). Taylor was specifically charged as follows:

Count 1: conspiracy to possess with the intent to distribute heroin and cocaine base (crack) in violation of Title 21, United States Code, Sections 846 and 841;

Count 2: discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j); and

Count 3: discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j).

An arrest warrant was issued for Taylor.

In connection with the arrest warrant, on July 20, 2015, law enforcement applied for a federal warrant authorizing the United States of America to obtain certain records related to the

3

cellular telephone associated with phone number (314) 224-1365, known to be utilized by Taylor. (True and accurate copies of the "Cellular Telephone Warrant" application, affidavit, and warrant are attached as <u>Exhibit 17A</u>, <u>17B</u>, and <u>17C</u>, respectively.) [1]  Among other things, the Cellular Telephone Warrant application sought: (a) precision location information (Exh. 17A pp. 3-4); (b) cell site location information (Id. at pp. 4-7); and (c) pen register, trap and trace and the use of a cell site simulator (Id. at p. 7-11).

In support of the application, United States Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Mark Wynn submitted a written affidavit that detailed the on-going investigation into Taylor's involvement in the murders and, more specifically, the importance of utilizing (a) precision location information; (b) cell site location information; and/or (c) a pen register, trap and trace and cell site simulator in locating additional evidence related to the Davis murders and apprehending Taylor pursuant to the federal arrest warrant:

### Investigation and Probable Cause

> …The federal arrest warrant arising out of that indictment is presently active.  The indictment remains suppressed.
>
> The precise location of the subject cellular telephone is of particular importance to law enforcement to permit law enforcement to identify the subject cellular telephone's location and, by extension TAYLOR's location, for the purposes of apprehending him pursuant to the federal arrest warrant.  Law enforcement seeks to utilize these methods to avoid disclosure of the indictment and arrest warrant and/or compromising the integrity of the ongoing investigation.  Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation (Exh. 17B at pp. 2-4)…
>
> Based on the above information, there is probable cause to believe that the subject cellular telephone is being used in connection with the illegal possession of a firearm by a previously convicted felon and the possession of a firearm in furtherance of drug trafficking where one of more deaths resulted.   There is likewise probable cause to conclude that locating and monitoring the movements of

---

[1] Due to volume, a combined set of exhibits referenced by the United States in both this and its original filing will be provided separately to the Court and opposing counsel in electronic format.

4

>the subject cellular telephone will lead to the relevant evidence concerning violations [of federal law] by [Taylor] (Id. at p. 9).

After reviewing the application and sworn affidavit, United States Magistrate Judge Thomas C. Mummert expressly found the existence of probable cause (Exh. 17C at pp. 1-2), issued the Cellular Telephone Warrant, and ordered members of law enforcement to obtain from T-Mobile (the service provider of Taylor's cellular telephone) (a) precision location information and (b) cell site location information (Id. at p. 2-4). The Cellular Telephone Warrant also expressly permitted law enforcement to utilize the investigative techniques involving a pen register, trap and trace and cell site simulator (Id. at p. 4-6). (Stated another way for purposes of Taylor's motion, the Cellular Telephone Warrant specifically contemplated and described the use of a cell site simulator.)

Pursuant to the Cellular Telephone Warrant, T-Mobile provided detailed precision location information to law enforcement. (A true and accurate copy of the information produced by T-Mobile is attached as Exhibit 18.) Based upon this information, investigators were able to place Taylor's phone at or near the area of 1513 Ogden Avenue. Investigators then established surveillance of the area for the time period July 20-24, 2015. In short order, Taylor was observed. Specifically, Taylor was observed entering and exiting the 1513 Ogden Avenue residence. (True and accurate photographs of Taylor taken during the course of surveillance are attached as Exhibit 19.) It was the T-Mobile information and agent surveillance – not a cell site simulator as Taylor suggests – that brought law enforcement to Taylor and 1513 Ogden (see Doc. #117 p. 3).

Based upon the information being obtained from T-Mobile and investigators' surveillance, a cell site simulator was utilized on July 22, 2015. The purpose was to confirm that Taylor's cellular telephone – and likely by extension Taylor – was physically present inside the 1513 Ogden residence.

Cell site simulators work because cellular telephones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route

5

and connect individual communications. When sending or receiving a communication, a cellular device, for example a cellular telephone, broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

To determine the location of a cell phone, a cell site simulator broadcasts signals that will be received by the target cell phone or receives signals from nearby cellular devices, including the target cell phone. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the target cell phone and thereby prompt it to send signals that include the unique identifier of the cell phone. Law enforcement may monitor the signals broadcast by the target cell phone and use that information to triangulate the target cell phone's location, even if it is located inside a house, apartment, or other building.

The device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations attempt to limit the interference with such devices. In order to connect with the target cell phone, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the target cell phone, and law enforcement limits collection of information from devices other than the target cell phone. To the extent that any information from a cellular device other than the target cell phone is collected by the device, law enforcement deletes that information and makes no investigative use of it, other than distinguishing the target cell phone from all other cellular devices.

Use of the cell site simulator did, in fact, connect the presence of Taylor's cellular telephone to 1513 Ogden on July 22. As the "After Action Report" notes: "Subject phone was located at 1513 Odgen [sic] Ave., St. Louis MO. Apprehension has not been made, waiting on plan from [ATF Kansas City Field Division]." (A true and accurate copy of the After Action Report is attached as Exhibit 20.) This was the *single* instance of the cell site simulator's use.

6

Law enforcement continued its surveillance of the area for the next day and a half and prepared to apprehend Taylor pursuant to the federal arrest warrant on the morning of July 24, 2015.  On July 24, law enforcement officials observed Taylor enter and exit the 1513 Ogden residence.  Taylor was apprehended on the morning of July 24, 2015.

## SUPPLEMENTAL RESPONSE

### THE USE OF A CELL SITE SIMULATOR TO CONFIRM THE PRESENCE OF TAYLOR'S CELLULAR PHONE INSIDE THE 1513 OGDEN RESIDENCE WAS CONDUCTED PURSUANT TO A VALID WARRANT PROPERLY SUPPORTED BY PROBABLE CAUSE OR, ALTERNATIVELY, BY GOOD FAITH.

**A.   A Search Warrant Was Issued.**

To be clear: The United States obtained a search warrant supported by probable cause to justify its use of a cell site simulator.[2]  According to the Supreme Court, a search warrant complies with the Fourth Amendment when it meets three criteria:  it was issued by a neutral

---

[2] No one should be confused by references to the Electronic Communications Protection Act (ECPA), Title 18, United States Code, Section 2703, contained in the Cellular Telephone Warrant documents.  ECPA Section 2703(d) orders are issued by courts on a finding that the government has offered "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). This standard is "higher than a subpoena, but not a probable cause warrant." H.R. Rep. No. 103-827(I), at 31 (1996), reprinted in 1996 U.S.C.C.A.N. 3489, 3511.  However, as discussed herein, the United States went well beyond that standard and affirmatively established probable cause (see Exh. 17B).  A probable cause warrant was, in fact, issued (see Exh. 17C).

Of course, if Taylor were to argue that the Cellular Telephone Warrant were an ECPA order, Taylor is bound by the reality that ECPA does not provide a statutory suppression remedy.  *See* 18 U.S.C. § 2708.  *See* 18 U.S.C. § 2708.  Accordingly, nonconstitutional violations of ECPA do not result in suppression of evidence.  *See* 18 U.S.C. § 2708 ("The [damages] remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("the Stored Communications Act expressly rules out exclusion as a remedy"); *United States v. Kennedy*, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) ("[S]uppression is not a remedy contemplated under the ECPA."); *United States v. Hambrick*, 55 F. Supp. 2d 504, 507 (W.D. Va. 1999) ("Congress did not provide for suppression where a party obtains stored data or transactional records in violation of the Act."), aff'd, 225 F.3d 656, 2000 WL 1062039 (4th Cir. 2000); *United States v. Reyes*, 922 F. Supp. 818, 837-38 (S.D.N.Y. 1996) ("Exclusion of the evidence is not an available remedy for this violation of the ECPA. . . . The remedy for violation of [18 U.S.C. § 2701-11] lies in a civil action.").

7

magistrate; it was based on a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense;" and it satisfies the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1979).

The Cellular Phone Warrant satisfies each of those criteria. First, it was issued by a neutral magistrate, United States Magistrate Judge Thomas C. Mummert (Exh. 17C). Second, the issuing judge found probable cause to support the warrant (Id. at pp. 1-2). This finding of probable cause is "afforded great deference on review," and this Court will not upset it "unless there was no substantial basis for that finding." *United States v. Wallace*, 713 F.3d 422, 427 (8th Cir. 2013). As discussed below, the court's finding of probable cause was amply supported by the facts in the application.

Third, both the application and warrant describe the objects of the warrant with particularity. As an initial matter, the warrant described Taylor's cellular telephone with particularity, by phone number (314) 224-1365. The warrant further enumerated (at pages two through six) the phone records to be obtained and the techniques to be utilized, including "Pen Register, Trap and Trace, Cell Site Simulator" which:

> "...may be installed and used to record or decode dialing, routing, addressing, or signaling information transmitted by the subject cellular telephone number, and to capture the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing and signaling information reasonably likely to identify the source of a wire or electronic communication to and from the subject telephone number..." (Exh. 17C at pp. 4-5).

In other words, the warrant authorized investigators to determine the precise location of Taylor's cellular telephone via a cell site simulator. *See United States v. Rigmaiden*, No. CR-08-0814-001-PHX-DGC, 2013 WL 1932800, at *18-*19 (D. Ariz. May 8, 2013) (rejecting defendant's argument that warrant directed to telecommunications providers did not authorize cell site simulator, and holding "[t]he plain and common sense reading of [the warrant] is that Verizon was to assist the FBI by providing information and other services while the FBI used a mobile tracking device in a public location to find the [cell phone] aircard").

8

The crux of Taylor's argument appears to be that the application submitted to the Court did "not describe with particularity what information data is scooped using the device" and "[w]ithout these details, the application is overbroad…" (Doc. #117 p. 2). This argument is contrary to the Supreme Court's interpretation of the particularity requirement for a warrant.

In *United States v. Karo*, 468 U.S. 705, 718 (1984), a bumper-beeper tracking device case, the Supreme Court described the information that must be included in a warrant to track an item's location. In addition to describing "the circumstances that led agents to wish to install the beeper," the warrant must "describe the object" to be tracked and specify "the length of time for which beeper surveillance is requested." Id. In this case, the facts supporting the court's finding of probable cause constitute the circumstances that justify the location tracking; Taylor's cell phone is the object to be tracked; and the duration of tracking is delineated as 45 days. Because the Cellular Telephone Warrant readily satisfies these particularity requirements, it complies with the Fourth Amendment.

The scope of the particularity requirement may be distilled to essentially "two matters . . . the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97 (2006). "Nothing in the language of the Constitution or in th[e] [Supreme] Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed." *Id.* at 98 (quoting *Dalia*, 441 U.S. at 255). Here, the warrant particularly authorizes the use of a "cell site simulator." It is unclear to the United States how the Cellular Telephone Warrant could be any more precise.

The argument made by Taylor here – that the warrant should have said more about the use of the cell site simulator – was explicitly rejected in *Rigmaiden*, 2013 WL 1932800. There, the court held:

> Although the warrant did not describe the precise means by which
> the mobile tracking device would operate, what signals it would
> send to the aircard, what signals it would capture, or the fact that
> it would cause some of Defendant's electricity to be consumed in
> the process, these and the many other details of the device's

9

>operation described in Defendant's motion clearly concern the manner in which the search was to be executed, something that need not be stated with particularity in the warrant. *Id.* at *17 (citing *Dalia*, 441 U.S. at 257-58; *Grubbs*, 547 U.S. at 97-98).

Still, Taylor suggests that the search warrant application here is overbroad "in that it allows law enforcement to search and seize information from a person unrelated to suspected criminal activity and also information pertaining to third parties to whom it lacks any probable cause" (Doc. #117 p. 2). The *Rigmaiden* court rejected precisely this argument: "Although it is true . . . that the application did not disclose that the mobile tracking device would capture signals from other cell phones and aircards in the area of Defendant's apartment, the Court regards this as a detail of execution which need not be specified under *Dalia*." *Rigmaiden*, 2013 WL 1932800 at *20.

The reasoning of *Rigmaiden* is fully applicable here. The Cellular Telephone Warrant satisfied the Fourth Amendment because it specified its objective with particularity. At every opportunity in this investigation – in the present scenario and in the various scenarios addressed in the United States' original opposition -- the investigators went to great lengths to pursue legal process from neutral magistrates, including applying for, and obtaining, a search warrant that permitted officials to utilize a cell site simulator. (It was a separate, independent search warrant that ordered officials to search 1513 Ogden as discussed in the United States' original opposition.) Therefore, there is nothing to suggest that the actions taken by the officers were improper in any way.

10

### B.     Probable Cause Existed.

The Cellular Telephone Warrant expressly permitting law enforcement to utilize a cell site simulator (as well as other investigative methods) was lawfully issued on July 20, 2015. The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir. 2002).

As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213 (1983), more fully:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Jones v. United States,* 362 U.S., at 271, 80 S.Ct., at 736; *see also United States v. Baker*, No. 1:11CR 103 JAR, 2012 WL 12527307, at *11 (E.D. Mo. Sept. 29, 2012), *report and recommendation adopted sub nom. United States v. Turner*, No. 1:11CR103 JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015).

The Court offered the following caution to reviewing courts, *Id.* at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli, supra,* 393 U.S., at 419, 89 S.Ct., at 590.
>
> "A grudging or negative attitude by reviewing courts toward warrants," *Ventresca,* 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." *Id.,* at 109, 85 S.Ct., at 746.

11

For a warrant to issue properly under the Fourth Amendment, the warrant must be supported by probable cause. *Gates*, 462 U.S. at 238-39; *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006). Probable cause exists, if under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238-39. In deciding whether there is probable cause to support a warrant, a judge may draw reasonable inferences from the totality of the circumstances. *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007), cert denied, 128 S. Ct. 875 (2008).

Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules. The Supreme Court found, 462 U.S. at 231, quoting from *Brinegar v. United States* (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

In analyzing the Cellular Telephone Warrant, it is important to note that it was applied for and issued on July 20, 2015 -- days after a federal grand jury had returned a suppressed indictment against Taylor on July 16, 2015. A valid, federal arrest warrant existed. Law enforcement did not know where Taylor could be physically located for apprehension purposes.

Similarly, for months prior to that, an on-going federal grand jury investigation into Taylor's involvement in the murders of Erin and Juanita existed. Law enforcement officials had not yet recovered the murder weapon and possessed information from credible source(s) that Taylor may still possess the murder weapon.

The purpose of the Cellular Telephone Warrant, among other things, was the apprehension of Taylor and, if possible, the recovery of the murder weapon. The United States made its application for the Cellular Telephone Warrant "upon a showing of probable cause" based upon Special Agent Wynn's affidavit which "allege[d] facts in order to show that there is

probable cause..." (Exh. 17A at pp. 2-3, ¶ 4).  The affidavit expressly set forth the bases of the investigation and probable cause to include, among other facts, (a) the belief that Taylor was utilizing cellular phone number (314) 224-1365; (b) the commission of the murders; (c) the ballistic evidence related to the murders; (d) the existence of the suppressed federal indictment and federal arrest warrant; and (c) the importance of identifying the cellular telephone's location for purposes of apprehending Taylor pursuant to the federal arrest warrant (Exh. 17B at pp. 2-4)

As set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would locate Taylor and/or discover evidence of a crime. *See Gates,* 462 U.S. at 238; *Oropesa,* 316 F.3d at 766.  Given the totality of the circumstances, a reasonable person could believe there was a fair probability that Taylor and/or evidence of a crime would be found as a result of law enforcement's use of the information or investigative techniques sought pursuant to the Cellular Telephone Warrant.  Probable cause supported the warrant.

**C.     Good faith.**

If this Court should find no probable cause for the issuance of the warrant, the search and seizure was still valid pursuant to the "good faith exception" announced in *United States v. Leon,* 468 U.S. 897, 923 (1984).  *Leon* held that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded as a matter of law.  *Id.* at 923. The Court held, "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." (*Id.* at 925).

Should this Court find probable cause lacking, the *Leon* exception should apply because there was a facially valid warrant that was reasonably relied upon.  Evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith

13

reliance on the warrant is objectively reasonable.  *United States v. Perry,* 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Here, the good-faith exception applies.  There is no evidence to suggest that: (a) Judge Mummert abandoned his detached and neutral role; (b) the officers were dishonest or reckless in preparing the affidavit; (c) the officers' reliance on the warrant was not in good faith; or (d) the officers' reliance was not reasonable. *See  United States v. Baker*, No. 1:11CR 103 JAR, 2012 WL 12527307, at *12–13 (E.D. Mo. Sept. 29, 2012), *report and recommendation adopted sub nom. United States v. Turner*, No. 1:11CR103 JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822939, at *33 (D. Minn. July 20, 2010), *report and recommendation adopted in part*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822925 (D. Minn. Nov. 22, 2010), *aff'd in part,* 702 F.3d 1092 (8th Cir. 2013).  Just the opposite is true: the attesting agent affirmatively stated in his affidavit that he believed probable cause existed and United States Magistrate Judge Mummert

14

agreed by signing and issuing the warrant. [3]

\* \* \*

The limited, single use of a cell site simulator was conducted pursuant to a valid search warrant supported by probable cause or, alternatively, the search was conducted consistently with the good faith exception to the warrant requirement.  In either case, the actions undertaken by law enforcement were lawful.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[3] It bears noting that, like the good faith exception to the exclusionary rule, the exceptions for attenuation and inevitable discovery also apply.  Under the attenuation exception, the exclusionary rule does not apply where "the link between the illegality and th[e] evidence was sufficiently attenuated to dissipate the taint," *Segura v. United States*, 468 U.S. 796, 815 (1984), including "when the causal connection is remote" or when "the interest protected by the constitutional guarantee that has been violated would not be served by suppression." *Hudson v. Michigan*, 547 U.S.586, 592-93 (2006).  Here, Taylor was initially located and connected to the 1513 Ogden address by the information provided by T-Mobile and the subsequent surveillance that occurred as a result of the T-Mobil information.  The cell site simulator was not utilized for that purpose.  Likewise, Taylor was actually arrested while walking out of the 1513 Ogden residence over a day *after* the cell site simulator was used on a single occasion (and surveillance was continued).  Of course, the actual search of the 1513 Ogden residence – which Taylor seems to challenge as well – is even more distant since, again, Taylor was located by use of T-Mobile records and surveillance (not a cell site simulator) and a separate, independent search warrant was applied for and obtained directed to the 1513 Ogden residence after Taylor was arrested.

Similarly, the inevitable discovery doctrine permits the evidence seized from defendant, or, in this case, the locating of Taylor himself, to be admitted, even if not lawfully seized, because that evidence "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  Defendant was actively sought, and would have continued to be sought, regardless of any use of the cell site simulator, for an active federal arrest warrant.

## CONCLUSION

For the foregoing reasons, and based upon additional information that may be provided during the evidentiary hearing on this issue, the United States of America respectfully requests that the Court deny in its entirety Taylor's second motion to suppress evidence.

    Respectfully submitted,

    RICHARD G. CALLAHAN
    United States Attorney

    /s/ Thomas Rea
    THOMAS REA, #53254MO
    Assistant United States Attorneys
    111 South Tenth Street, 20th Floor
    Saint Louis, Missouri 63102
    (314) 539-2200

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 13, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties and counsel of record.

    /s/ Thomas Rea
    THOMAS REA